IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| Eric Williams, )<br><br>Plaintiff, )<br><br>vs. )<br><br>Rochling Automotive USA, LLP, )<br><br>Defendant. )<br>_____ ) | Civil Action No. 7:11-3497-MGL-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This matter is before the court on the defendant's motion for summary judgment (doc. 52).  In his amended complaint, the plaintiff alleges claims against his former employer for violation of the Americans with Disabilities Act ("ADA") and interference with rights under the Employee Retirement Income Security Act of 1974 ("ERISA").  The basis for both causes of action is the plaintiff's allegation that he was terminated from employment because of the healthcare costs associated with two of his children who have cystic fibrosis.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) DSC, all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTS PRESENTED

The defendant is a manufacturing company located in Duncan, South Carolina, which produces automotive plastic parts.  The plaintiff was hired by the defendant as a cost accountant on October 1, 2004 (def. m.s.j. ex. 1, Burleson aff. ¶ 4).  The former Plant Manager promoted the plaintiff from cost accountant to Controlling Manager in 2006. The plaintiff was promoted to Accounting Manager in February 2008 (*id.*, Burleson aff. ¶ 5). In his 2006 performance review, at which time he was Controlling Manager, the plaintiff's overall performance rating was "exceeds job requirements" (pl. resp. m.s.j., ex. 4, 2006 performance review).  In "areas to work on," Rob Merritt, who was the defendant's Vice

President - Commercial at that time, stated, "Show respect for co-workers by being on time and prepared for meetings. Keep a daily appointment calendar and check it on a regular basis. Use a timer on your watch or computer as a reminder for meetings. Show willingness to make a personal investment in self-development by taking courses and attending seminars outside work hours" (*id.*).

Former Human Resource Director Jane Woloszyn testified in her deposition that it was "general knowledge" among the defendant's Human Resources department and supervisors that the plaintiff's children had cystic fibrosis (def. m.s.j., ex. 5, Woloszyn dep. 15). Ms. Woloszyn testified that the plaintiff was permitted to take the time he needed away from work to do what he needed to do for his family (*id.*, ex. 6, Woloszyn dep. 29). According to the plaintiff, the defendant made a donation to the Cystic Fibrosis Foundation at his request (*id.*, ex. 7, pl. dep. 31).

In 2007, the defendant began to experience economic decline due to the recession. The defendant was forced to reduce its workforce from 685 in 2006 to 199 in December 2009 (def. m.s.j., ex. 1, Burleson aff. ¶ 9). The plaintiff testified he knew that the defendant was operating at substantial monthly losses, sometimes over one million dollars a month (*id.*, ex. 8, pl. dep. 80). Ms. Woloszyn testified that the defendant's management instituted a cost-cutting initiative that lasted for two years. During this initiative, management met monthly and attempted to identify areas where costs could be reduced (*id.*, ex. 9, Woloszyn dep. 41, 48). The plaintiff testified in his deposition that during the monthly financial meetings, which he attended, high medical costs were always a subject, but other cost-cutting measures were also discussed (*id.*, ex. 10, pl. dep. 24-25). The plaintiff admitted in his deposition that reducing healthcare costs is typical corporate conversation (*id.*, ex. 11, pl. dep. 40-41).

Sandra Schmidt was hired by the defendant as the Commercial Manager in January 2008 and became the plaintiff's immediate supervisor. Ms. Schmidt reported to Robert Eimer, who at that time was General Manager and is now President (def. m.s.j., ex. 12, Schmidt aff. ¶¶ 1, 6; *id.*, ex. 14, pl. dep. 19). Ms. Schmidt stated in her affidavit that

2

when she began her employment with the defendant, the accounting department was in disarray. She implemented some changes in accounting processes and established some disciplines, especially in cash forecasting and financial statement account reconciliations. Ms. Schmidt and the accounting employees worked long hours to improve the defendant's records and procedures (*id.*, Schmidt aff. ¶¶ 4-5). Ms. Schmidt stated in an email to Evelyn Thome, dated June 6, 2008: "Eric's son is in the hospital – he has Cystic Fibrosis and must go in the hospital occasionally for IV treatments. He must be there for two weeks – very hard on a boy and also hard on the parents" (def. reply, ex. 8, email).

In or about late 2008, the defendant, which is a partially self-insured company, hired a new insurance consultant named John Ferguson. Mr. Ferguson met with Ms. Schmidt and Ms. Woloszyn in late 2008 regarding the January 2009 insurance renewal. According to Mr. Ferguson, it is a normal practice at a renewal for him to go over the current year's costs (called a specific analysis report) and the future expected costs (called an excess loss medical assessment or E.L.M.A.) for high risk individuals' health care costs (pl. resp. m.s.j., ex. 9, Ferguson dep. 45, 69, 78, 158, 160). On the 2008 report, the plaintiff had one child with a claim amount of $35,165.20 and an E.L.M.A. of $5,000 to $20,000, and another child with a specific claim amount of $69,532, with no E.L.M.A. provided. On the 2009 report, the claim amount for one of the plaintiff's children was $82,297.89, and the E.L.M.A. for that child was $35,000 to $65,000. The other child is not listed on the 2009 report (*id.*, ex. 16).

In March 2008, Evelyn Thome, who had worked with the plaintiff during her assignment as Interim Commercial Manager, wrote the plaintiff a letter thanking him for his support "in calculating cost rates and all kind of overhead rates to negotiate with our customers" and for his help in "piec[ing] together missing information on current projects" and "develop[ing] missing procedures." She also stated that she appreciated the plaintiff's support during the year end audit and his availability to work long hours (pl. resp. m.s.j., ex. 6). On April 21, 2008, Ms. Schmidt and Mr. Eimer hand delivered a letter to the plaintiff to

3

thank him for his "extraordinary effort," "hard work," and "positive attitude" during a very busy time period (*id.*, ex. 7).

Ms. Schmidt gave the plaintiff his 2008 and 2009 performance reviews (def. m.s.j., ex. 12*,* Schmidt aff. ¶ 6). In the 2008 performance review, which was signed by the plaintiff on June 9, 2008, she rated the plaintiff as "needs improvement" in two categories, "communications" and "planning and organization"(*id.*, ex. 16, 2008 performance review). Ms. Schmidt observed that the plaintiff needed to improve in time management, planning for himself and for the finance department overall, in keeping an accurate task list, and to regularly access his ability to meet his financial deadlines (*id.*). Ms. Schmidt also observed that the plaintiff was slow in responding to requests for information and he needed to work on his knowledge of the current accounting pronouncements (*id.*). The plaintiff's overall performance rating was "meets job requirements." Ms. Schmidt noted as follows in the summary: "Eric took over the supervisory responsibility for the finance department in February 2008. The last year was demanding and stressful on all members of the finance department. Eric has maintained a positive attitude and is doing his part to help the company move forward" (*id.*). Ms. Schmidt listed as the plaintiff's development plans the following: "focus on accounting side of finance department, work on making realistic commitments and meeting them, general accounting seminars – two in calendar 2008, one between 1/1 and 6/30/09" (*id.*).

In the 2009 performance review, the plaintiff received an overall "needs improvement" performance rating (def. m.s.j., ex. 17, 2009 performance review). He received "unsatisfactory" in the categories of "initiative" and "planning and organization" (*id.*). The unsatisfactory rating in "initiative" was due to his failure to take the time management course that Ms. Schmidt encouraged him to take (*id.*). She also noted that the plaintiff did "not seek further depth in finance." Under the unsatisfactory rating in "planning and organization," Ms. Schmidt also observed that the plaintiff did not plan his time and his work was not sufficiently organized, which caused too many inefficiencies in his performance (*id.*).

4

The plaintiff submitted an addendum to his 2009 performance review, disagreeing with his overall rating of "needs improvement" (def. m.s.j., ex. 18, pl. addendum).  In the addendum, the plaintiff admitted he did not pursue the time management course but stated, "[o]ne of the reasons I did not do this was because I did not feel it was a good time to spend money on a time management course with all of the layoffs going on and our current financial losses" (*id.*).  Regarding the comments about his planning and organization, he stated, "I will admit I need improvement in this area and that my desk looks like a hurricane hit it.  However, all of the financial reporting deadlines are being met."  He also stated that no other departments made complaints about him (*id.*).

The plaintiff was assigned a project to convert the defendant's fixed asset accounting from a stand alone system to a module in SAP.[1]  A month after Ms. Schmidt gave the plaintiff his 2009 performance review, she was advised that nine months of the plaintiff's work on the project was deleted in the course of computer system maintenance. The plaintiff became aware that the data was lost on June 12, 2009, but he did not inform Ms. Schmidt.  According to Ms. Schmidt, on June 23, 2009, she found out from a colleague in Germany that the data had been deleted, and, at that point, the data was irretrievable. Ms. Schmidt stated in her affidavit that if the plaintiff had informed her or if the issue had been escalated when the plaintiff first knew of it, they would have been able to retrieve all of the data from a system backup (def. m.s.j., ex. 12, Schmidt aff. ¶¶ ).

The defendant produced electronic mail correspondence from the plaintiff to several of his peers while working for the defendant in which he apologized for delays or for missing financial deadlines (def. m.s.j., ex. 19, 22).  The defendant also submitted emails written during the plaintiff's employment by Mr. Eimer.  In one of the emails, Mr. Eimer wrote to the plaintiff on February 20, 2008, stating, "[T]his is the fourth reminder to update your to do . . . WHAT ELSE DO I HAVE TO DO?! (*id.*, ex. 21 at 2).  On October 8, 2008, Mr. Eimer wrote to the plaintiff and said, "[W]hat is going on in accounting?! where

---

[1]While not defined by the parties, SAP is, presumably, a type of software.

are the invoices? why are we accruing so much?" (*id*. at 3). On November 13, 2008, Mr. Eimer wrote to the plaintiff, "I rejected it twice: June and July – why is no one from accounting following up with the vendor?  Why is no one from accounting escalating it in time if the issue cannot be resolved by accounting?" (*id*. at 4).

The plaintiff claims that subsequent to his 2009 performance review, he was recruited for employment in another of the defendant's divisions by a manager named Sherry Lance, who told him about a position she had open.  He claims Ms. Lance told him that she went to talk to Mr. Eimer about it, but when he found out Ms. Lance wanted to hire the plaintiff, he said no (pl. resp. m.s.j., ex. 12, pl. dep. 88).  The plaintiff further claims that Ms. Lance wrote a letter dated September 28, 2009, in which she lauded him as a "very loyal employee with many years of accounting experience."  She went on to say in the letter that the plaintiff's "knowledge of the many processes within the accounting and controlling functions are unprecedented," that "Mr. Williams has shown nothing short of professionalism in every aspect of his core competencies", and that "Mr. Williams goes above and beyond to get the job accomplished" (*id.*, ex. 13).

The defendant submitted Ms. Lance's affidavit as an exhibit to its reply brief. Ms. Lance stated in her affidavit that neither the plaintiff nor his attorney have ever contacted her.  She attested that she did not write the letter, would not have used the words or phrases that are used in the letter, would not have identified herself in the manner in which she is identified, could not have given an opinion regarding accounting and controlling functions because she has no experience with those, and would not have referenced a carbon copy on any letter she typed.  She stated that she does not remember signing the letter, and she does not think that she did.  Ms. Lance also attested that she did not make an offer of employment to the plaintiff nor did she have the authority to do so.  Ms. Lance stated that she joked with the plaintiff one day at lunch about him coming to work for her.  She stated she was trying to change the conversation because he was making her uncomfortable by speaking negatively of another manager, Ms. Schmidt (def. reply, ex. 22, Lance aff. ¶¶ 1-7 ).

6

According to Ms. Schmidt, it became apparent several months after the plaintiff's 2009 performance review that he did not intend to improve his performance. She stated in her affidavit that she and Mr. Eimer decided to terminate the plaintiff's employment and replace him (def. m.s.j. ex. 12, Schmidt aff. ¶ 12). On August 27, 2009, Ms. Schmidt and Mr. Eimer sent Ms. Thome an e-mail asking her opinion about their decision to terminate the plaintiff, and Ms. Thome replied, "[I] am congruent with proposal from [Ms. Schmidt] and [Mr. Eimer] to replace Eric Williams. He doesn't promote the processes, is completely unorganized (no improvement can be seen), and with a salary of 88 TUSD he is too costly" (*id.*, ex. 23). The plaintiff was told he was being terminated from employment on September 14, 2009, and, pursuant to his employment agreement, he was given three months notice, which made December 14, 2009, his last day of employment (*id.*, Burleson aff. ¶¶ 5-6). On October 7, 2009, Mr. Eimer responded to the president of another of the defendant's facilities stating, "[W]e terminated [the plaintiff's] contract with a 90 day notice. We had too many instances in the past where he was not able to follow through with tasks that were assigned to him. He is too unorganized for an accounting manager"(*id.*, ex. 24).

The plaintiff testified in his deposition that Ms. Schmidt and Mr. Eimer told him when he was terminated from employment that he was not "in the long term plan" of the company (pl. resp. m.s.j., ex. 12, pl. dep. 22). The plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). In its position statement in response to the charge, the defendant stated that the plaintiff's employment was terminated "after two negative reviews documented in his personnel file from 2008 and 2009 and a $200,000 loss to [the defendant] caused by his lack of supervision of his department" (*id.*, ex. 11 at p. 2). The defendant submitted an affidavit from Ms. Schmidt as an exhibit to its position statement. In that affidavit, Ms. Schmidt stated that the plaintiff's

> lack of attention to detail and last minute rush projects resulted in [the defendant] losing $200,000 of its 2009 bottom line numbers. Specifically, [the plaintiff] was required to oversee accounts receivables as part of his job duties. He failed to do so and the unpaid accounts receivables accumulated. Unfortunately, when he discovered it, he was not able to

7

>        provide the supporting documentation he needed to prove to
>        [the defendant's] customers that they owed the amounts the
>        accounts receivables database indicated and, therefore, [the
>        defendant] had to ultimately write-off $200,000 of accounts
>        receivables that could not be sufficiently documented.

(*Id.*, ex. 11 at p. 25).  The plaintiff's expert accounting witness opined in his report that the defendant failed to produce any documentation showing the calculation for the $200,000 loss asserted by Ms. Schmidt as being caused by the plaintiff (*id.*, ex. 19 at p. 15). The defendant stated in its responses to the plaintiff's first requests for production that it "was not able to locate any direct reference to the [$200,000] write-off on the 2009 tax return" (*id.*, ex. 20, resp. to request no. 9).  Tania Richert, who worked as the General Ledger Accountant when the plaintiff was the Accounting Manager, attested in her affidavit that the plaintiff "would not communicate" the results of their efforts to recover the $200,000 write-off to Ms. Schmidt or Mr. Eimer because she perceived he was scared to tell them it was not recoverable despite the fact that was part of his job to do so as the Accounting Manager (def. reply, ex. 23, Richert aff. ¶ 4).

The defendant's fiscal year 2010 Budget Assumptions document, which showed a revision date of December 14, 2009,[2] listed as item 10: "Assumed $200K reduction in total personnel costs - amount to be accomplished between pay rate reductions and health care cost savings.  Total amount is shown as a reduction in health care costs until further analysis can be made" (pl. resp. m.s.j., ex. 14).  Ms. Schmidt testified in her deposition that she prepared the document (*id.*, ex. 3, Schmidt dep. 38-39).  According to Ms. Schmidt, there were approximately thirty budget planning meetings, and the plaintiff attended those meetings.  She further testified that they would have begun to discuss the budget assumptions for 2010 by the end of August and first of September 2009 (def. reply, ex. 15, Schmidt dep. 33; *id.*, ex. 16, Schmidt dep. 34, 166-67).

The plaintiff testified that he thought the 2010 budget assumption identifying a $200,000 reduction in personnel and healthcare costs specifically targeted him "[b]ecause

---

[2]This was the plaintiff's last day of employment (def. m.s.j., ex. 1, Burleson aff. ¶ 6).

it was exactly the amount that my children - the cost of my healthcare costs for my children in one year" (def. reply, ex. 10, pl. dep. 26).

The defendant's insurance consultant, Mr. Ferguson, testified in his deposition that, as a partially self-funded company, the defendant had two types of insurance: specific stop loss insurance and aggregate stop loss insurance.  The specific stop loss insurance limited the defendant's liability to $50,000 for each claimant.  The defendant "self-funded" the first $50,000 for any claimant, and the insurance company insured the amount over that.  Accordingly, the highest expense the defendant would incur in any given year for treatment of the plaintiff's two children[3] was $50,000 per child, for a total of $100,000 (def. reply, ex. 11, Ferguson dep. 22-23, 33-34, 146-47).

Ms. Schmidt testified in her deposition that the $200,000 budget assumption was derived from a benchmarking study that revealed the defendant's Duncan plant was not in line with the percentage of personnel costs of the defendant's other entities (*id.*, ex. 13, Schmidt dep. 168).  Ms. Schmidt testified that the defendant attempted to meet the reduction by adopting appropriate salary ranges per job category and reducing pay to come in line with the ranges, scrutinizing overtime, and reducing healthcare costs by increasing employee contributions or reducing coverage (*id.*, ex. 14, Schmidt dep. 169-70).

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257.  In determining

---

[3]The plaintiff has a third child who does not have cystic fibrosis.

whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds by* 490 U.S. 228 (1989).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.

### *ADA*

Title I of the ADA prohibits an employer from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4).  "A family relationship is the paradigmatic example of a 'relationship' under the association provision of the ADA." *Trujillo v. PacifiCorp.*, 524 F.3d 1149, 1154 (10th Cir. 2008) (internal quotation marks and citation omitted). To make out a *prima facie* case of discriminatory discharge under the ADA, the plaintiff must prove:  (1) the plaintiff was in the protected class; (2) he was discharged; (3) at the time of discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4)  his discharge occurred under circumstances that raise a reasonable inference of

unlawful discrimination. *Ennis v. National Ass'n of Business and Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995).

The *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) scheme of proof applies to such claims under the ADA. *Ennis*, 53 F.3d at 58. Accordingly,

> [T]he plaintiff has the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. If the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. If the defendant meets this burden of production, the presumption created by the *prima facie* case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination.

*Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was " 'not its true reason[ ], but [was] a pretext for discrimination.' " *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010) (Title VII case) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext "'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.'" *Id.* (quoting *Burdine*, 450 U.S. at 256) (alterations in original). To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is "unworthy of credence." *Burdine*, 450 U.S. at 256. "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and

11

there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. *Id*. Accordingly, the court must evaluate "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id*. at 148–49. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of ... whether the plaintiff was the victim of intentional discrimination." *Merritt*, 601 F.3d at 294–95.

The defendant argues that the plaintiff cannot meet the third factor of a *prima facie* case, showing that at the time of discharge he was performing his job at a level that met his employer's legitimate expectations. This court agrees with the defendant. As evidence of his adequate performance, the plaintiff cites his "years of successful work in the accounting department, a promotion to accounting manager just 18 months prior to his termination, multiple letters from [his] supervisors regarding his professional expertise, and a glowing letter by another of [the defendant's] managers just weeks prior to his termination" (pl. resp. m.s.j. at p. 8). The plaintiff asserts that 2009 was his first notice of any performance issues and then only from his immediate supervisor, Ms. Schmidt, and he claims the negative review was precipitated by the defendant learning of his children's health costs (*id.* at p. 3). However, he ignores comments from his 2008 performance review in which Ms. Schmidt stated the plaintiff "needs improvement" in two categories, "communications" and "planning and organization." While the overall performance rating was "meets job requirements," Ms. Schmidt observed that the plaintiff needed to improve in time management, planning for himself and for the finance department overall, in keeping an accurate task list, and to regularly access his ability to meet his financial deadlines. Ms. Schmidt also observed that the plaintiff was slow in responding to requests for information and he needed to work on his knowledge of the current accounting pronouncements. The plaintiff also ignores the emails he received from Mr. Eimer, who at that time was General

12

Manager, regarding delays and his own numerous emails to his peers admitting to and apologizing for delays.  The plaintiff also does not address the missed fixed asset deadline, which occurred after his negative 2009 performance review, and his failure to let Ms. Schmidt know that the needed data had been deleted.  The plaintiff's reliance on two letters from March and April 2008 from supervisors, including Ms. Schmidt, thanking him for his support, hard work, and positive attitude are insufficient to create an issue of material fact given the overwhelming evidence in the record of the plaintiff's performance issues including lack of organization, timeliness, and inefficiency.

The defendant further argues that the plaintiff cannot meet the fourth element of a *prima facie* case, that his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.   Again, this court agrees with the defendant that the plaintiff cannot establish this element.  The plaintiff relies on the 2010 Budget Assumptions document, which "the exact same day that he was fired outlin[ed] the expected savings in approximately the same amount as the healthcare costs for [his] children" (pl. resp. m.s.j. at p. 9).  The plaintiff argues in response to the motion for summary judgment:

> The document's notation of $200,000 in expected health care and personnel costs savings for 2010 was close to the amount of [the defendant's] savings on [the plaintiff's] salary and [his] children's expected medical expenses for the upcoming year. Indeed, per [the defendant's] insurance consultant, the company's total exposure for health costs from the Williams' family for 2010 was right at $250,000.00.

(*Id.* at p. 5).  The plaintiff argues that while the 2009 specific analysis/E.L.M.A. report only shows a specific claim of $82,297.89 for one child, the two children received essentially the same treatment and had nearly the same expenses in 2009.  Thus, the plaintiff contends that the actual expenses for his children for 2009 were closer to $166,000, and if the $20,000 in salary savings for the plaintiff is added, the total savings for the defendant was $186,000 (*id.* at p. 5 n.39; *see id.*, ex. 16).

13

However, the plaintiff's argument is not supported by the record in this case. The defendant's insurance consultant, Mr. Ferguson, testified in his deposition that the $250,000 figure for the company's total exposure for the plaintiff's family applies only "if all five of [the plaintiff's family members] were in an automobile accident and hurt to such a degree that it was a great deal of money for each of them then yes, theoretically, [the defendant] could pay the first $50,000 on each of those five individuals for a total of $250,000" (def. reply, ex. 12, Ferguson dep. 24). As a partially self-funded company, the defendant's specific stop loss insurance limited the defendant's liability to $50,000 for each claimant. The defendant "self-funded" the first $50,000 for any claimant, and the insurance company insured the amount over that. Accordingly, the highest expense the defendant would incur in any given year for treatment of the plaintiff's two children was $50,000 per child for a total of $100,000 (*id.*, ex. 11, Ferguson dep. 22-23, 33-34, 146-47).

The plaintiff also focuses on the date of the document, which shows a revision date of December 14, 2009, his last date of employment, to infer discrimination. However, the undisputed testimony in this case is that during the economic downturn management met monthly and attempted to identify areas where costs could be reduced (def. m.s.j., ex. 9, Woloszyn dep. 41, 48). The plaintiff testified in his deposition that during the monthly financial meetings, which he attended, high medical costs were always a subject, but other cost-cutting measures were also discussed (*id.*, ex. 10, pl. dep. 24-25). According to Ms. Schmidt, there were approximately thirty budget planning meetings, and the plaintiff attended those meetings. She further testified that they would have begun to discuss the budget assumptions for 2010 by the end of August and first of September 2009 (def. reply, ex. 15, Schmidt dep. 33; *id.*, ex. 16, Schmidt dep. 34, 166-67). Ms. Schmidt testified in her deposition that the $200,000 budget assumption was derived from a benchmarking study that revealed the defendant's Duncan plant was not in line with the percentage of personnel costs of the defendant's other entities (*id.*, ex. 13, Schmidt dep. 168). Furthermore, the plaintiff testified that he saw the 2010 budget proposal sometime in the fourth quarter of 2009, prior to leaving employment with the defendant (*id.*, ex. 19, pl. dep 26).

14

The plaintiff's allegation that the 2010 Budget Assumptions document was only drafted and unveiled on his last day of employment and represented the cost savings associated with his termination from employment is not supported by the evidence and is insufficient to meet the fourth element of a *prima facie* case. "Subjective belief... without more, is insufficient to create a genuine issue of material fact as to any discriminatory conduct on (the employer's) part." *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 134-35 (4ᵗʰ Cir. 2002). In a case similar to this one, the Fourth Circuit Court of Appeals granted summary judgment in favor of the employer in a lawsuit brought against it by a former employee who alleged she was discharged due to the potential high medical costs of her child who had been diagnosed with HIV. *Ennis*, 53 F.3d at 55. The plaintiff in *Ennis* based her allegations on a memorandum from the director of human resources that alerted the employees who participated in the employer-sponsored health care plan that, "if we have a couple of very expensive cases, our rates could be more dramatically affected than they currently are." *Id*. at 57. The court stated:

> The trier of fact would have to infer from an innocuous notice informing employees about their insurance, that [the employer] wanted to prevent its employees from filing expensive claims against its insurance, that [the employer] knew [the plaintiff's] son was HIV-positive and would incur substantial medical expenses, and that [the employer] decided to fire [the plaintiff] as a direct result. The building of one inference upon another will not create a genuine issue of material fact.

*Id*. at 62 (citing *Beale v. hardy*, 769 F.3d 213, 214 (4ᵗʰ Cir. 1985)). Thus, the court found that the plaintiff failed to establish a *prima facie* case on the third and fourth elements of the cause of action for discriminatory discharge under the ADA. *Id*. Here, the court would have to infer that the $200,000 reduction in total personnel costs described in the document was in reference to the plaintiff's children's medical costs and his own salary despite the undisputed evidence described above that the $200,000 was double what the defendant would ever have to pay for the plaintiff's children's medical costs and the evidence that the budget assumptions were based upon a benchmarking study and would have been

discussed at the budget planning meetings several months prior to the plaintiff's last day of employment.

Even if the plaintiff could establish a *prima facie* case of discriminatory discharge under the ADA, the defendant had met its burden of stating a legitimate, nondiscriminatory reason for terminating the plaintiff's employment. Thus, the plaintiff must show that the defendant's stated reason for terminating his employment was pretext for discrimination. The plaintiff argues that the defendant's "inconsistent and shifting defenses are sufficient evidence of pretext to support a judgment for the plaintiff" (pl. resp. m.s.j. at p. 10). This court disagrees. The plaintiff argues that he was initially told that he was discharged because he was "not in the long term plan of the company," but, in response to his EEOC charge, the defendant changed its reason to a claim that the plaintiff caused the company a $200,000 loss, and now at summary judgment, "having conceded the falsity of this allegation through deposition testimony of [the defendant's] employees," the defendant claims the plaintiff was fired because he "had a messy desk" (pl. resp. m.s.j. at p. 10).

While the defendant has apparently backed off of its claim before the EEOC that the plaintiff's "lack of supervision of his department" caused the company to have to write off $200,000 in accounts receivable, the undersigned cannot say that the defendant's stated reason for the plaintiff's termination from employment has been "inconsistent and shifting" as argued by the plaintiff. *See EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 849-50 (4th Cir. 2001) (finding that the defendant's different justifications at different times for failing to hire the plaintiff was probative of pretext). Here, the defendant has consistently stated before both the EEOC and this court that the plaintiff was terminated from employment based upon his performance. For example, in the position statement before the EEOC, Ms. Schmidt stated that the plaintiff's "issues did not arise from his absences at work, because he was most usually at work. His problems arose from his procrastination in tackling projects too close to their deadlines, in failing to supervise his staff properly, and in his lack of planning and organization" (pl. resp. m.s.j., ex. 11 at pp. 3, 23). While the

16

plaintiff argues that the defendant now claims it fired him because he had a messy desk, the defendant has in reality argued and produced ample evidence that the plaintiff was fired because of his performance issues, which specifically included lack of organization, timeliness, and inefficiency. Based upon the foregoing, the undersigned finds that even if the plaintiff could establish a *prima facie* case of discrimination, he has, at most, created only a weak issue of fact as to whether the employer's reason for terminating his employment was untrue. As there is abundant and uncontroverted independent evidence that no discrimination occurred, summary judgment on this claim is appropriate. *Reeves*, 530 U.S. at 148.

### ERISA

Under Section 510 of ERISA, which is captioned "Interference with protected rights," an employer may not discharge a participant or beneficiary in an ERISA plan "for exercising any right to which he is entitled under the provisions of an employee benefit plan ... [or] ... [ERISA Title I]," or "for the purpose of interfering with the attainment of any right to which [he] may become entitled under the plan . . . ." 29 U.S.C. § 1140. "[T]o take advantage of § 510, one must prove a specific intent of the employer to interfere with an employee's pension rights." *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 239 (4th Cir. 1991). "[T]he *McDonnell Douglas* scheme of presumptions and shifting burdens of production is appropriate in the context of discriminatory discharge claims brought under § 510 of ERISA." *Id.*

The court in *Conkwright* found that the plaintiff in that case did not prove the requisite intent, stating:

> Conkwright's § 510 claim ultimately fails because he does not demonstrate a genuine issue on the matter of pretext. In fact, there is no evidence supporting Conkwright's claim of pretext other than the fact that his termination saved Westinghouse money. While plaintiff's termination probably did save Westinghouse money, this is not enough to carry the day. As a number of courts have recognized, it is not sufficient for an employee to allege lost opportunity to accrue additional benefits as evidence of the employer's specific intent to violate

17

ERISA; rather, a plaintiff must adduce facts, which if taken as true, could enable a jury to identify unlawful intent from the other various reasons why an employer might have terminated plaintiff, and to conclude that the employer harbored the requisite unlawful intent. . . .

Conkwright tries to save his claim by citing statements that Westinghouse sought to meet its "financial need" by terminating him, and that financial need necessarily includes pension costs. Conkwright's suggestion that Westinghouse acted illegally because it acted to save money proves too much. Under that reasoning, any actions by an employer that result in savings would be suspect. It is obvious that benefit costs make up a large amount of the costs of an employee to a company, and that pension rights are a substantial component of benefit costs, but these undeniable propositions are not sufficient standing alone to prove the requisite intent by the path of pretext.

*Id.*

Here, the plaintiff has failed to establish that the defendant's actions were specifically motivated by a desire to deny him benefits protected by ERISA. Accordingly, for the same reasons as with his ADA claim, he has failed to produce sufficient evidence to support a reasonable inference of pretext, and summary judgment is thus appropriate on this claim. *See Goode v. American Veterans, Inc.*, 874 F.Supp.2d 430, 453-54 (D. Md. 2012) (granting summary judgment on ERISA § 510 claim where only evidence supporting claim of pretext was email discussion regarding the cost-saving potential of the plaintiff's termination as there was no evidence that "benefits in particular were targeted").

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment (doc. 52) be granted.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 25, 2013
Greenville, South Carolina

18